Dissenting Opinion by BATTAGLIA, J., which McDonald, j., joins.
I respectfully dissent.
The Majority applies the holding of Taylor v. Harford Cnty. Dep’t of Soc. Servs., 384 Md. 213, 862 A.2d 1026 (2004), a case involving the physical abuse of a child, to vacate all of the determinations of the administrative law judge (“ALJ”), the Circuit Court, and the Court of Special Appeals and rule that a mother cannot be found to have committed indicated child abuse, mental injury, when she subjected her daughter to repeated invasive sexual examinations as well as investigations by the Washington County Department of Social Services (“the Department”).
The following specific findings of the ALJ regarding Ms. McClanahan’s behavior toward her daughter (“R”), when her daughter was between the ages of two to five years old, are certainly more graphic than the Majority describes. The ALJ found that Ms. McClanahan took R to the hospital on nine different occasions for Sexual Assault Forensic Examinations (“SAFE”)[1] over a three and a half year period:
*714 10. The occasions on which the Appellant reported alleged sexual abuse and took R[ ] to a medical provider for treatment are as follows:
• On June 7, 2007, the Appellant had taken R[ ] to the hospital after R[ ] returned from her father’s house with redness and irritation in her vaginal area. The hospital instructed the Appellant to take R[ ] to the Child Advocacy Center for a SAFE exam. Dr. Ruth Ann Dwyer performed the examination of R[], the results of which were normal. (Dept.4)
• On February 21, 2008, the Appellant had taken R[ ] to the Child Advocacy Center for an examination after R[ ] had returned from her father’s house with her vaginal area red and swollen and she had reported that her father’s 8-year-old stepson, Sean, hurt her. Dr. Dwyer performed a SAFE exam of R[ ] and diagnosed R[ ] with vulvitis, which is often caused by poor hygiene and is not uncommon in prepubescent children. (Dept.5)
• On March 23, 2008, the Appellant had taken R[ ] to the Waynesboro Hospital in Pennsylvania reporting that R[ ] had stated that her “bottom hurt.” She had reported that her father put things in her vagina. R[ ] reported to the treating physician that a monster came from the cave and touched her. The physician noted that R[ ]’s vaginal area was red but that her hymen was intact. Pictures of R[ ]’s vaginal area were taken during the exam. (Dept.6)
• On April 28, 2008, the Appellant had taken R[ ] to Washington County Hospital. The Appellant reported that R[ ] had returned that day from her father’s house and had been reporting that “someone hurt her bottom.” The Appellant requested that a SAFE be performed on R[ ]. A SAFE exam was performed, the results of which revealed some redness in the vaginal area. (Dept.7)
*715 • On May 26, 2008, the Appellant had taken R[] to the Washington County Hospital requesting a sexual assault examination of R[]. The Appellant had reported to a hospital physician that R[ ] had returned from her father’s home that day and reported that her “bottom hurt” and that “Sean had put a lollipop in her bottom.” The Appellant also reported that R[ ] had discharge in her panties earlier that day. (Dept.8). R[ ] also volunteered to the doctor that Shawn had put a lollipop in her bottom. (Dept.8)
• On May 26, 2008, Washington County Hospital performed a SAFE examination on R[ ] which revealed no indicia of sexual abuse. (Dept.8)
• On December 6, 2009, the Appellant had taken R[ ] to the Chambersburg Hospital in Chambersburg, Pennsylvania. R[ ] had reported that her father hurt her “bottom” and stuck her with a needle there. The Appellant reported that R[ ]’s vulva was red and swollen. (Dept.9)
• On December 6, 2009, upon examination of R[ ], the doctor noted mild erythema and swelling in the inferior vulva; foul discharge present but no other redness. A urianalysis that was requested by the Appellant was unremarkable.
• On June 23, 2010, after R[ ] returned from a visit with her father, the Appellant took R[ ] to Chambersburg Hospital emergency room. The Appellant reported that R[ ] had stated that her father “poked her with a needle in her front bottom.” R[] reported to hospital staff that her “front bottom” hurts. (Dept.10). Upon examination of R[ ], the physician noted “mild erythema” and “foul-smelling whitish discharge noted on retraction of vulva.” R[ ] was diagnosed with a urinary tract infection at Chambers-burg Hospital. Chambersburg Hospital does not perform SAFE exams. (Dept.10)
• On June 23, 2010, the Appellant took R[ ] to Washington County Hospital for a SAFE exam. R[ ] was not cooperative for the exam so the Appellant brought her back to the *716 hospital later that same day for an exam. R[ ] reported at the hospital that her father “stuck a needle in her front bottom.” R[] further reported that her father touched her the previous night. The SAFE examination revealed redness around R[]’s labia majora but no trauma was noted. (Dept.12)
• On November 17, 2010, the Appellant took R[ ] to White Oak Pediatric for a cough and injury. After R[ ] reported that she was there for her “bottom,” Jane Shughart, the physician’s assistant (PA), examined R[]’s vaginal area. She observed redness in the area with mucus discharge and what appeared to be a black coarse hair. Ms. Shugar referred the Appellant to Emergency Room to do further evaluation. (Appellant 1). The Appellant took R[] to Washington County Hospital where R[ ] reported that her father “pokes her with a needle and puts cream on her front bottom.” The Washington County Hospital physician refused to perform a SAFE exam based on the request of the local department and its report that R[] had undergone numerous previous SAFE exams. (Dept.13)
The ALJ also found that the Department had “conducted approximately 14 investigations pertaining to R[ ] and allegations of abuse” and that every investigation of sexual abuse of R by her father had resulted in a ruled out disposition. Further, the ALJ’s findings questioned the bases for the numerous examinations and investigations initiated by Ms. McClanahan:
20. R[] has not demonstrated sexual behavior symptoms that are typical of a child that has experienced sexual abuse at the level alleged by the Appellant.
21. Redness in the vagina area and discharge are not uncommon medical occurrences in children of R[ ]’s age and are often the result of poor hygiene (Dwyer testimony).
22. R[ ]’s statements of alleged sexual abuse by her father are made to the Appellant upon her return to the Appellant from visits with her father. R[ ]’s statements to profession *717 als regarding the alleged abuse are most always made in the presence of the Appellant and not followed up on with the professional at a later time.
23. R[ ] has never made a disclosure of sex abuse to CPS workers during any of the investigations. (McCarthy testimony).
The ALJ found that R suffered mental injury based upon the reports of Dr. Carlton E. Munson and Mr. Ronald E. Zuskin, but specifically attributed the source of that injury to Ms. McClanahan based on the evaluation provided by Dr. Munson:
27. It is the opinion of Dr. Munson that R[] has been mentally injured and that the source of the injury is the Appellant’s engaging in suggestive utterances to R[ ] about abuse by R[ ]’s father and engaging in alienating activities related to the father. (Dept. 17, page 21)
28. It is the opinion of Dr. Munson that R[] has been mentally injured and that the source of the injury is the Appellant’s exploitation of R[ ] by her use of sexual abuse allegations, investigations and examinations which encourages the development and reinforcement of aberrant behavior by drawing R[ ] in a closer relationship to the Appellant. (Dept. 19)
The ALJ, thus, affirmed the Department’s finding of indicated child abuse, mental injury, by Ms. McClanahan. In doing so, the ALJ used language upon which the Majority seizes regarding Ms. McClanahan’s motives:
The evidence presented by the local department has led me to conclude that the Appellant’s actions were either an intentional attempt to manipulate and influence the outcome of an ongoing custody dispute with R[ ]’s father, or were a result of her subconscious efforts to have R[ ] remain close to her. A finding of indicated abuse mental injury is appropriate as the Appellant’s actions have resulted in the mental injury of R[ ].
The Majority, however, in doing so, obviates the ALJ’s finding that Ms. McClanahan’s actions, which include reporting sexual abuse allegations, taking R to various hospitals for treatment, *718 and subjecting R to intrusive sexual examinations, were intentional and “resulted in the mental injury of R” and that the ALJ specifically found that Ms. McClanahan’s “act of making multiple allegations of sex abuse of R[] by her father and subjecting R[] to repeated sexual abuse exams constitutes child abuse mental injury.”
The first holding of the Majority with which I disagree, however, is that the standard used in Taylor, a child abuse physical injury case, should be applied in a child abuse, mental injury, case. In Taylor, the father’s act of kicking a footstool that hit his daughter without intent to hurt the child did not constitute child abuse, physical injury. In that case, the ALJ had applied Section 5—701(b)(1)[2] of the Family Law Article and rejected the father’s defense of “accident” as encompassed by the ruled out provision of COMAR 07.02.07.12C(2)(a)(i),[3] which stated that:
A finding of ruled out child abuse is appropriate if child abuse did not occur. A finding of ruled out may be based on credible evidence that:
*719 (2) In the case of physical abuse:
(a) The alleged abuser was not responsible for the injury for reasons including, but not limited to, one of the following:
(i) The act causing the injury was accidental or unintentional and not reckless or deliberate[ ]
Id. at 225-26, 862 A.2d at 1033. We determined that the father’s act of kicking the stool was “unintentional”, such that physical child abuse was ruled out.
The Taylor holding, however, is totally inapplicable to a child abuse, mental injury, case, because by its very terms COMAR 07.02.07.12C(2)(a)(i), then and now, is limited in scope to “physical injury.” The Majority points to nothing to support its conclusion that it “decline[s] to enforce the portion of COMAR 07.02.07.12C that limits its exculpatory scope (for accidental injury) to alleged abusers causing physical injury.” Maj. Op. at 711, 129 A.3d at 304. Clearly, physical abuse is different from mental abuse not only in the types of acts of the perpetrator and the harm experienced by the child victim, but, most importantly, in the recognition that physical injury can result from accidental or unintended acts while mental injury of a child by a caretaker cannot. The Majority does not cite any basis for its lumping physical and mental abuse together, nor can I discern any.
Even assuming Taylor’s holding can apply in the context of mental injury, with which I vehemently disagree, the Majority, nevertheless, errs because of its emphasis on a piece of the opinion by the ALJ that Ms. McClanahan’s actions were “a result of her subconscious efforts” to rule out child abuse, mental injury. Here, Ms. McClanahan’s acts met the standard of intentional abuse, not accidental injury.
The Majority equates the ALJ’s discussion of subconscious motive with unintentional acts when it states that “[a] standard of liability reaching the subconscious level veers much too close to strict liability for parental decisions”, Maj. Op. at 711, 129 A.3d at 305, thereby conflating motive and intention. The ALJ never said that Ms. McClanahan’s conduct was *720 unintentional or unconscious but rather was specific in finding intention and volition in the acts of Ms. McClanahan when stating: “I have found that [Ms. McClanahan’s] act of making multiple allegations of sex abuse of R[] by her father and subjecting R[] to repeated sexual abuse exams constitutes child abuse mental injury.” The ALJ also found that Ms. McClanahan’s “exploitation” of R by “her use of sexual abuse allegations, investigations and examinations” caused R’s mental injury. The ALJ, thus, consistently found Ms. McClanahan’s conduct to be volitional and intentional.
The important distinction between subconscious motive and intentional acts has been persuasively articulated in Johnson v. Metropolitan Life Ins. Co., 273 F.Supp. 589, 593 (D.N.J.1967), aff'd, 404 F.2d 1202 (3d Cir.1968). In Johnson, a widow of a man who committed suicide sought to recover under a policy excluding death benefits from a suicide, under a number of theories, one of which was that her husband was “irresistibly compelled by impulse to immolate himself, and therefore, that his action was no more the product of a conscious intent that [sic] would be a purely accidental act”. Id. at 594. The Court rejected the widow’s theory and explained:
In this regard, one must be careful to distinguish questions of intent and questions of motive. Psychoanalytically oriented and other schools of “depth psychology” have made the notions of “unconscious” or “subconscious” motive common parlance. But it is not helpful to define “suicide” as an intentional self-destruction, and then to confuse the slippery notion of “intent” with its underlying causes.
Whatever the constellation of drives, impulses or subconscious motives which cause the subject to perform a given act, unless that act is actually inadvertent, its physical execution is “intentional” in the ordinary sense of the word. In short, my motive for doing, or impulse to do, the act is one thing; the fact that I therefore intend to do it and do so is a separate point and one that is not here in doubt.
Id. In the present case, Ms. McClanahan intended to subject her child to nine sexual examinations and fourteen investiga *721 tions, all of which resulted in mental injuries. Ms. McClanahan’s motives, as found by the ALJ, included “to manipulate and influence the outcome of an ongoing custody dispute” or to “have R[ ] remain close to her.” Ms. McClanahan’s actions were not inadvertent or beneficent but were intentional and caused injury to R.
I would affirm. Judge McDonald authorizes me to state that he joins the views expressed in this dissenting opinion.

. In her findings, the ALJ explained that, “SAFE exams are conducted by doctors who are SAFE trained and when there is a concern of sexual abuse or assault. SAFE exams require retraction of the genitalia and *714 are not routinely conducted on children between two and five years old.”

. Section 5-701(b) of the Family Law Article of the Maryland Code (1984, 1999 Repl.Vol., 2004 Supp.) defined 'abuse' and provided:
(1) the physical or mental injury of a child by any parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member, under circumstances that indicate that the child’s health or welfare is harmed or at substantial risk of being harmed; or
(2) sexual abuse of a child, whether physical injuries are sustained or not.

. Following Taylor, in 2007, COMAR 07.02.07.12C(2)(a)(i) was amended to "restate the language more clearly, consistent with [Taylor]". 34 Md. Reg. 2025 (November 9, 2007) and it now provides:
A finding of ruled out child abuse is appropriate if child abuse did not occur. A finding of ruled out may be based on credible evidence that:
(2) In the case of physical abuse:
(a) The alleged abuser was not responsible for the injury for reasons including, but not limited to, one of the following:
(i) The contact with the child was accidental and unintended and under the circumstances, the injury was not foreseeable[ ]